Good morning. May it please the Court, I'm Katherine Hart, representing Appellant Enrique Goldbaum. Your Honors, this case presents an important issue of the deportation of material witness. There are a plethora of cases stemming from Valenzuela Bernal, in which the United States Supreme Court in 1982 addressed the issue of the deportation of material witness. In the Valenzuela Bernal case, the government had actually interviewed witnesses, deported two, kept one of them here. This case that you are presented with today can be distinguished from this plethora of other cases in which witnesses were deported, in the sense that in this case we have two people who were involved in a prison affray. My client, Mr. Goldbaum, and Valentin Sepulveda, the alleged victim in this case. What makes Mr. Valentin Sepulveda, the deported witness, what makes his testimony material, is the fact that he is the one who was an initial aggressor in this particular act. If I could interrupt you for a moment. One concern I had was how Mr. Goldbaum would show prejudice from his, from Mr. Sepulveda's deportation. How would he even make a, I didn't see anything in the record being a plausible basis that Mr. Sepulveda's testimony would have helped him. Can you help me on that? Yes, yes. I'd like to help you with that, Your Honor, because that's the most important issue to address here. What is significant about Mr. Sepulveda is that, according to my client, there was a dispute earlier in that day involving Coco, another prisoner. And there was a dispute that day about whether one should carry a shank in the prison. Now, Mr. Sepulveda was the initial aggressor in this particular affray on the prison grounds. And what I mean by that is that, unlike these other cases, Mr. Sepulveda strode over and confronted my client. It's not easy to tell that from the record. It is stated in the record that he strode over. The testimony that he strode over is often referred to. I understand what your client says happened there, but I'm just wondering what's the basis for thinking that Mr. Sepulveda would testify in a way that would be helpful to your client? Was there any evidence that he was willing to testify in a way that would essentially incriminate himself? I don't have evidence that he was willing to testify, but I don't think that I have to prove that he would have been willing to testify. I think I have to prove to this Court that his testimony would have been material. And although I know it's somewhat oxymoronic when a deported witness and you have to show materiality, but I think we don't have his story about why he initially strode over and confronted my client. It wasn't until I actually looked at the video, and Mr. Rooney made that available to me in the last week, it wasn't until I looked at the video that I think I really understood the whole crux of this case. In the video, Mr. Sepulveda, he, well, strides over. It looks as if he lopes over. There is this track, this prison track that the prisoners are walking on out in the yard. My client is hovering at the fence line, and Mr. Sepulveda strides forthrightly over. I mean, to me, when I viewed it, it looked as if he loped over. He sort of galloped over in a confrontational stance. Now, that to me suggests that there was some type of bad blood between the two of them. There was, I mean, because I don't think people usually just confront each other out of the blue. It doesn't make sense. So your argument is regardless of what he actually, Sepulveda actually would have testified, just from the facts in the record, you can see that if he testified truthfully, it would be material and favorable. Is that what you're arguing? Yes. If he were to testify truthfully, then he would be asked questions about why did he adopt such a confrontational stance? Why did he depart from the track that the inmates were walking along in the yard? Why did he suddenly deter from that and then go on this sort of avalanche of confrontation to my client? Nobody ever answered that. And the testimony at trial had to do with guards, one of whom came later after the whole fray was over and they saw that my client had the weapon and appeared to have the weapon in the lanyard on his hand. And, of course, the jury was able to look at the video itself. But as the trial counsel pointed out, Mr. Sepulveda could have answered some questions about whether he had had the weapon or not. Now, let's just assume that even – let's assume, which is not highly likely, that he was willing to testify against himself and that there was some prejudice. Don't you have to establish bad faith to begin with on the part of the government? That's where I'm having some trouble when I lined up all the players of which, as you know, there are many in this case of officers who touch some part of the case. Where do you pinpoint the bad faith on the part of the government? The bad faith was the deportation without ever interviewing the material witness. And the fact is this was different from the alien smuggling cases because those witnesses were apprehended right at the time and then immediately deported. This incident occurred in April, and then the indictment was not until July 26th. There was three months in which that witness could have been interviewed. Now, the bad faith – The mere fact that the witness was not interviewed is what you say is imputed bad faith, correct? Yes. But there's explanations for why, given the different agencies that touched this and the reason they didn't – the FBI decided not to interview. What do we do with that explanation? Well, there's explanations, but I don't think that bad faith has to be a necessarily – well, an apprehension on the part of the investigating officers that they are intentionally trying to deprive my client of his rights. I don't think there was a mindset there where anyone said, we are going to intentionally deprive him, acknowledgeably, of his rights. But that, in effect, was what happened because bad faith is an intentional act that redounds to somebody else's tactical advantage. And in this case, the bad faith is that the prison officers deferred to the FBI. The prison officers said, well, we don't investigate a case when it's going to be turned over for criminal prosecution to the FBI. And then the FBI agent, Marty Robinson, he testified in the evidentiary hearing. He said, well, we rely on the completeness of the prisoner investigations. How did you get around Dring? Maybe you can help me with that. In Dring, the defendant raised the argument that if the government fails to detain and interview the witness, we must presume prejudice, and then we agree that it's the criminal defendant, what we said, who bears the burden of proving that the government acted in bad faith. So it seemed like in Dring the idea was the mere failure to act wasn't enough to establish bad faith. That's correct. But in Dring, the particular facts in that case were that the facts were overwhelmingly in favor of the government. And Dring himself had been seen on the pier. It was an issue of identification. And he was seen on the pier. And then I believe his vehicle was followed. And then he was identified at another place. And there was a lot more evidence against him. And so the prejudice there was weighed against the fact that there was abundant evidence against him. In this particular case, we have a jury that split on the assault count and then convicted on the possession. But the jury split. The case was by no means overwhelmingly in favor of the governments, because even though at the beginning of the video you can see where Sepulveda is the initial aggressor, you can't ‑‑ it's grainy enough that you can't see what happens all the way through. So the only two people who really knew exactly what happened were those two individuals, which is different from these other ‑‑ Did you save the rest of your time for rebuttal? Oh, excuse me? Did you want to save the rest of your time for rebuttal? Oh, yes, I do. Thank you. May it please the Court. Kevin Rooney on behalf of the United States. I think the argument is very well set forth. The Court's addressing what the issues on the deportation. First of all, bad faith, I think it's a Carreno case, and it's your opinion, Judge McKeon, since it's ‑‑ I'm sorry, it's Ramirez. Let me just back up. I'm sorry, it's the exact site of the bad faith. It's defined as a deliberate attempt to gain a tactical advantage. I'm sorry, I'm not having the exact citation. And I don't see any way on the record here you can show a deliberate attempt by the government to have a tactical advantage. The government, if we call it the prosecution, the FBI, and, frankly, the Bureau of Prisons, there was never any indication whatsoever that the alleged victim in the case, Mr. Sepulveda, had anything favorable to say for Mr. Goldbaum, that he in any way had anything that would help Mr. Goldbaum. The ‑‑ It doesn't matter whether he was willing or not he was willing to testify, if, in fact, his testimony would be material and favorable to the defendant. I think that's a theory that we perhaps don't need to reach, because the cases say, certainly his testimony would be material. Certainly defense counsel could try to make an argument that the court give him immunity. I think that's a real stretch that the court would be forced to give him immunity, because the cases where there's immunity not sought by the prosecution but ordered by the court is where the government has somehow interfered with the fact‑finding process. And there wasn't anything like that. But favorable, I think it's just my understanding of the word favorable would be that the person would come in and say, it was all my fault. I assaulted Mr. Goldbaum. He just defended himself. That was Mr. Goldbaum's version of events, that Mr. Sepulveda held a knife out on his open hand. Mr. Goldbaum snatched it in self‑defense. Mr. Goldbaum was punched by Mr. Sepulveda. Mr. Goldbaum defended himself with the knife. The district court found this to be so implausible that the district court enhanced Mr. Goldbaum's sentence for perjury. So I don't ‑‑ that's where I'm coming from. I don't see how the defense can say it's favorable. I think the defense wants to maybe say if we could put Mr. Sepulveda on the witness stand and cross‑examine him, he's going to look so bad that his own inconsistencies are going to be favorable to our case. I think that's just an incredible stretching, if that's where the defense is coming from. If this person is going to testify against my client, but I can cross‑examine him and impeach him, that would be favorable to me. I think that stretches the word favorable beyond any recognition. I think that takes favorable out of it entirely, just as is material. There's no doubt that Mr. Sepulveda was percipient to the incident, but, again, I don't see that there's any showing that what he's got to say is favorable. We also go back, we revert to the DRING test, which is was there bad faith by the government? And the government, there's no showing whatsoever that there was any bad faith, that nobody ever at any point in the proceedings had any thought that Mr. Sepulveda had something to say that was exculpatory, in other words, exonerated Mr. Goldbaum from it. That's what I've got to tell the Court on that. I think the cases are very clear. I don't see the prejudice at all. I don't see any bad faith on the government's part. It was a lack of, obviously, a lack of communication as to Mr. Goldbaum's initial, his own statements that were exculpatory, but that was cleared up and provided in discovery just immediately before the trial. As to the instructional issue, counsel hasn't addressed it in argument. Defense counsel asked for a self-defense instruction. The government said the proper instruction was compulsion and duress. The government's proposed instruction left the defense with the burden of proof. The defendant insisted on self-defense. The Court was very clear to instruct on self-defense, both as to the weapons possession and the assault. Both counsel argued the case and clarified to the jury. Let me interrupt here. The request in terms of that, I know that counsel hasn't argued the issue, but when I read through the papers here, I was just curious. It seems that the government asked for a request under 6.6 of the model jury instruction. My take on this is that in Lennon, the Court clearly said that model rule 8.7 is the proper charge on a justification defense for weapons possession, which is a little bit more demanding than what the government actually asked for. They both, you know, have the burden of proof upon the defendant. But are you aware of model jury instruction 8.6? I'm sorry, 8.6. What is it? Are you aware of the Lennon case? No. All right. So in Lennon, because I just wondered, it seems to me that the Court was more than charitable here and that the government was even more than charitable. And Lennon, the Court clearly stated that to interpose a justification defense to a charge of violating the felony possession statute, Lennon must demonstrate that, one, he was under unlawful and present threat of death or serious bodily injury. That's the same as the government requested. Two, he did not recklessly place himself in a situation where he would be forced to engage in criminal conduct. That's a little more demanding than what the government was relying upon, which was, I think, 6.6. Three, he had no reasonable legal alternative. That's the same that you requested. And four, there was a direct causal relationship between the criminal action and the avoidance of the threatened harm. It seems to me that based upon the precedent of this Court in Lennon, that that would have been the proper charge for the Court to have given, and that what the government requested was even more favorable to the defendant. And, of course, what the Court ultimately did was even super favorable to the defendant by shifting the burden of proof. But that's true. That's exactly what the way I saw it. And then the only other thing I would add is because of the temporal sequence of events, it again was there was a question of should there be an instruction about compulsion, because self-defense wouldn't kick in until something happened. You have a lot of loosey-goosey language in the Court precedent in terms of what self-defense is all about when you're dealing with justification compared to compulsion compared to duress. Right. But it seems that your office might be well advised to read Lennon and to, in the future, ask for justification in accordance with Model Jury Instruction 8.6. That's just my reading of Lennon. Well, thank you. Yeah. All right. Unless the Court has any other questions, I'm finished. Thank you. Thank you. I always have to be told that my time is just about running out. Fifty-seven seconds. Okay. In terms of the materiality of Sepulveda, yes, I don't expect that Mr. Sepulveda, had he been available, that he would have admitted that the weapon was his. Of course, he probably wouldn't have. But I think the issue is would his testimony, was it essential to a fair determination of the case? And that language actually comes out of the informant language, Roviaro, 353 U.S. 53, which courts in Arizona v. Youngblood and Valenzuela-Bernal have used that test of the informant. Was it essential to a fair determination? And I think that he certainly could have talked about prior altercations between the two, prior affrays, prior disputes, prior bad blood that would have then lent more credibility to my client's self-defense case. And in terms of the jury instruction, there was an election at the lower court level on the part of the attorney to ask for self-defense because the burden was on the government, whereas compulsion requires the defendant to have the burden, and under compulsion the defendant cannot, has to retreat. Thank you. The case just argued, United States v. Obam, is submitted.
judges: McKeown, Ikuta, Block